REL: 07/25/2014

Notice: This opinion is subject to formal revision before publication in the advance sheets of **Southern Reporter**. Readers are requested to notify the **Reporter of Decisions**, Alabama Appellate Courts, 300 Dexter Avenue, Montgomery, Alabama 36104-3741 ((334) 229-0649), of any typographical or other errors, in order that corrections may be made before the opinion is printed in **Southern Reporter**.

# SUPREME COURT OF ALABAMA

## SPECIAL TERM, 2014

_____

## 1121291

_____

**Ex parte Edgetech I.G., Inc., n/k/a Quanex I.G. Systems, Inc.**

**PETITION FOR WRIT OF MANDAMUS**

**(In re:  Tiffin Motorhomes, Inc.**

**v.**

**Thompson I.G., LLC, et al.)**

**(Franklin Circuit Court, CV-13-900034)**

WISE, Justice.

1121291

Tiffin Motorhomes, Inc. ("Tiffin"),[1] sued Edgetech I.G., Inc., n/k/a Quanex I.G. Systems, Inc. ("Edgetech"); Quanex Building Products Corporation ("Quanex Building Products"); Thompson I.G., LLC, and RDM Consulting, LLC (hereinafter collectively referred to as "Thompson");[2] and Wynne Enterprises, Inc., in the Franklin Circuit Court. Edgetech filed a motion to dismiss the claims against it for lack of personal jurisdiction; the trial court denied the motion. Edgetech then filed this petition for a writ of mandamus requesting that this Court direct the trial court to vacate its order denying the motion to dismiss and to enter an order granting the motion and dismissing the case against it. We grant the petition and issue the writ.

Factual Background and Procedural History

Edgetech manufactures a foam spacer product, "Super Spacer," which is "sold in bulk and used by third-parties in the manufacture of insulated glass window units." Thompson,

---

[1]The materials before this Court refer to this entity as "Tiffin Motorhomes, Inc." However, we note that, in other cases, this entity has been referred to as "Tiffin Motor Homes, Inc."

[2]The amended complaint alleges that RDM was the successor company to Thompson.

a Michigan company, manufactures insulated-glass units for use in residential-home construction, in motor homes, and in recreational vehicles. Between 2005 and 2010, Thompson purchased Super Spacer "E-class" or ethylene propylene diene monomer ("EPDM") product from Edgetech and started using the Super Spacer product in its insulated-glass units. Thompson then sold insulated-glass units that contained the Super Spacer product to Wynne Enterprises, an Alabama company that manufactures windows. Wynne Enterprises then sold completed window units that contained the Super Spacer product to Tiffin, which manufactures motor homes in Red Bay. Tiffin installed the window units containing the Super Spacer product in its motor homes.

On February 15, 2013, Tiffin filed a complaint in the Franklin Circuit Court, naming as defendants Thompson I.G., LLC, Edgetech I.G., Inc., and Wynne Enterprises.[3] The complaint alleged that, after fabrication and installation, windows that had been manufactured using the Super Saver product had clouded, fogged, and failed; that there were

_____

[3]Tiffin subsequently filed amended complaints adding RDM Consulting, LLC, Quanex I.G. Systems, Inc., and Quanex Building Products as defendants.

1121291

issues with the adhesive used by Edgetech not adhering to the Super Spacer products; that the defendants had failed to remedy or to address the failure of the Super Spacer products; that the failure of the Super Spacer products had resulted in warranty claims against Tiffin; that the latent defect with the Super Spacer products required full replacement and installation of windows in motor homes using the Super Spacer products; and that Super Spacer products continued to fail in the field, causing Tiffin to continue to incur new warranty claims and associated costs. Tiffin alleged claims of breach of contract, breach of implied warranty, and breach of express warranty against all the defendants. It also alleged claims of fraud, suppression, and deceit against Edgetech, Thompson, and Quanex Building Products.

On April 17, 2013, pursuant to Rule 12(b)(2), Ala. R. Civ. P., Edgetech filed a motion to dismiss the claims against it for lack of personal jurisdiction. It subsequently filed a renewed motion to dismiss after Tiffin filed its first amended complaint. In its motion to dismiss, Edgetech argued that it did not have sufficient contacts with Alabama to

4

establish that Alabama courts had either general or specific personal jurisdiction over it.

On June 26, 2013, Tiffin filed its opposition to the motion to dismiss and the renewed motion to dismiss. Tiffin argued:

"General jurisdiction is proper as [Edgetech] has systematic and continuous contacts with Alabama due to its production facility in Decatur, Alabama;

"This Court has jurisdiction over Edgetech because it knew its products were being shipped to customers in Alabama;

"Edgetech purposely availed itself of the privilege of doing business in Alabama because it markets goods through a distributor who has agreed to serve as its sales agent in Alabama."

Alternatively, Tiffin requested an order allowing discovery directed to the issue of jurisdiction.

On July 10, 2013, the trial court entered an order denying Edgetech's motion to dismiss. Edgetech then filed its petition for a writ of mandamus with this Court.

### Standard of Review

"As we stated in Ex parte Duck Boo [International, Co., 985 So. 2d 900 (Ala. 2007)], this Court recently addressed the standard of review in a proceeding challenging the trial court's ruling on a motion to dismiss for lack of personal jurisdiction:

"'"'The writ of mandamus is a drastic and extraordinary writ, to be "issued only when there is: 1) a clear legal right in the petitioner to the order sought; 2) an imperative duty upon the respondent to perform, accompanied by a refusal to do so; 3) the lack of another adequate remedy; and 4) properly invoked jurisdiction of the court." Ex parte United Serv. Stations, Inc., 628 So. 2d 501, 503 (Ala. 1993); see also Ex parte Ziglar, 669 So. 2d 133, 134 (Ala. 1995).' Ex parte Carter, [807 So. 2d 534,] 536 [(Ala. 2001)]."

"'Ex parte McWilliams, 812 So. 2d 318, 321 (Ala. 2001). "An appellate court considers de novo a trial court's judgment on a party's motion to dismiss for lack of personal jurisdiction." Elliott v. Van Kleef, 830 So. 2d 726, 729 (Ala. 2002).

"'"'"In considering a Rule 12(b)(2), Ala. R. Civ. P., motion to dismiss for want of personal jurisdiction, a court must consider as true the allegations of the plaintiff's complaint not controverted by the defendant's affidavits, Robinson v. Giarmarco & Bill, P.C., 74 F.3d 253 (11th Cir. 1996), and Cable/Home Communication Corp. v.

Network Productions, Inc., 902 F.2d 829 (11th Cir. 1990), and 'where the plaintiff's complaint and the defendant's affidavits conflict, the ... court must construe all reasonable inferences in favor of the plaintiff.' Robinson, 74 F.3d at 255 (quoting Madara v. Hall, 916 F.2d 1510, 1514 (11th Cir. 1990))."'

"'"Wenger Tree Serv. v. Royal Truck & Equip., Inc., 853 So. 2d 888, 894 (Ala. 2002) (quoting Ex parte McInnis, 820 So. 2d 795, 798 (Ala. 2001)). However, if the defendant makes a prima facie evidentiary showing that the Court has no personal jurisdiction, 'the plaintiff is then required to substantiate the jurisdictional allegations in the complaint by affidavits or other competent proof, and he may not merely reiterate the factual allegations in the complaint.' Mercantile Capital, LP v. Federal Transtel, Inc., 193 F. Supp. 2d 1243, 1247 (N.D. Ala. 2002) (citing Future Tech. Today, Inc. v. OSF Healthcare Sys., 218 F.3d 1247, 1249 (11th Cir. 2000)). See also Hansen v. Neumueller GmbH, 163 F.R.D. 471, 474-75 (D. Del. 1995) ('When a defendant files a motion to dismiss pursuant to Fed. R. Civ. P.

12(b)(2), and supports that motion with affidavits, plaintiff is required to controvert those affidavits with his own affidavits or other competent evidence in order to survive the motion.') (citing Time Share Vacation Club v. Atlantic Resorts, Ltd., 735 F.2d 61, 63 (3d Cir. 1984))."

"'Ex parte Covington Pike Dodge, Inc., 904 So. 2d 226, 229-30 (Ala. 2004).'

"Ex parte Bufkin, 936 So. 2d 1042, 1044-45 (Ala. 2006)."

Ex parte DBI, Inc., 23 So. 3d 635, 642-43 (Ala. 2009).

## Discussion

Edgetech argues that the trial court erroneously denied its motion to dismiss because, it says, Tiffin did not satisfy its burden of proving that the trial court had in personam jurisdiction over Edgetech.

"'The extent of an Alabama court's personal jurisdiction over a person or corporation is governed by Rule 4.2, Ala. R. Civ. P., Alabama's "long-arm rule," bounded by the limits of due process under the federal and state constitutions. Sieber v. Campbell, 810 So. 2d 641 (Ala. 2001). Rule 4.2(b), as amended in 2004, states:

"'"(b) Basis for Out-of-State Service. An appropriate basis exists for

8

service of process outside of this state upon a person or entity in any action in this state when the person or entity has such contacts with this state that the prosecution of the action against the person or entity in this state is not inconsistent with the constitution of this state or the Constitution of the United States ...."

"'In accordance with the plain language of Rule 4.2, both before and after the 2004 amendment, Alabama's long-arm rule consistently has been interpreted by this Court to extend the jurisdiction of Alabama courts to the permissible limits of due process. Duke v. Young, 496 So. 2d 37 (Ala. 1986); DeSotacho, Inc. v. Valnit Indus., Inc., 350 So. 2d 447 (Ala. 1977). As this Court reiterated in Ex parte McInnis, 820 So. 2d 795, 802 (Ala. 2001) (quoting Sudduth v. Howard, 646 So. 2d 664, 667 (Ala. 1994)), and even more recently in Hiller Investments Inc. v. Insultech Group, Inc., 957 So. 2d 1111, 1115 (Ala. 2006): "Rule 4.2, Ala. R. Civ. P., extends the personal jurisdiction of the Alabama courts to the limit of due process under the federal and state constitutions." (Emphasis added.)

"'This Court discussed the extent of the personal jurisdiction of Alabama courts in Elliott v. Van Kleef, 830 So. 2d 726, 730 (Ala. 2002):

"'"This Court has interpreted the due process guaranteed under the Alabama

9

Constitution to be coextensive with the due process guaranteed under the United States Constitution. See <u>Alabama Waterproofing Co. v. Hanby</u>, 431 So. 2d 141, 145 (Ala. 1983), and <u>DeSotacho, Inc. v. Valnit Indus., Inc.</u>, 350 So. 2d 447, 449 (Ala. 1977). See also Rule 4.2, Ala. R. Civ. P., Committee Comments on 1977 Complete Revision following Rule 4.4, under the heading 'ARCP 4.2.' ('Subparagraph (I) was included by the Committee to insure that a basis of jurisdiction was included in Alabama procedure that was coextensive with the scope of the federal due process clause....'[4]).

"'"The Due Process Clause of the Fourteenth Amendment permits a forum state to subject a nonresident defendant to its courts only when that defendant has sufficient 'minimum contacts' with the forum state. <u>International Shoe Co. v. Washington</u>, 326 U.S. 310, 316, 66 S. Ct. 154, 90 L. Ed. 95 (1945). The critical question with regard to the nonresident defendant's contacts is whether the contacts are such that the nonresident

---

[4]Rule 4.2 was amended effective August 1, 2004, to delete the so-called "laundry list" of conduct that would subject an out-of-state defendant to personal jurisdiction in Alabama. <u>See</u> Committee Comments to Amendment to Rule 4.2 Effective August 1, 2004.

defendant '"should reasonably anticipate being haled into court"' in the forum state. Burger King Corp. v. Rudzewicz, 471 U.S. 462, 473, 105 S. Ct. 2174, 85 L. Ed. 2d 528 (1985), quoting World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 295, 100 S. Ct. 559, 62 L. Ed. 2d 490 (1980)."'

"Ex parte DBI, Inc., 23 So. 3d 635, 643-44 (Ala. 2009)(footnote omitted).

"'Furthermore, this Court has explained:

"'"... The sufficiency of a party's contacts are assessed as follows:

"'"'Two types of contacts can form a basis for personal jurisdiction: general contacts and specific contacts. General contacts, which give rise to general personal jurisdiction, consist of the defendant's contacts with the forum state that are unrelated to the cause of action and that are both "continuous and systematic." Helicopteros Nacionales de Colombia, S.A. v. Hall, 466 U.S. 408, 414 n. 9, 415, 104 S. Ct. 1868, 80 L. Ed. 2d 404

11

(1984); [citations omitted]. Specific contacts, which give rise to specific jurisdiction, consist of the defendant's contacts with the forum state that are related to the cause of action. Burger King Corp. v. Rudzewicz, 471 U.S. 462, 472-75, 105 S. Ct. 2174, 85 L. Ed. 2d 528 (1985). Although the related contacts need not be continuous and systematic, they must rise to such a level as to cause the defendant to anticipate being haled into court in the forum state. Id.'

"'"Ex parte Phase III Constr., Inc., 723 So. 2d 1263, 1266 (Ala. 1998) (Lyons, J., concurring in the result). ...

"'"In the case of either general in personam jurisdiction or specific in personam jurisdiction, '[t]he "substantial connection" between the defendant and the forum state necessary for a finding of minimum contacts must come about by an action of the defendant purposefully directed toward the forum State.' Asahi Metal Indus. Co. v. Superior Court of California, 480 U.S. 102, 112, 107 S. Ct. 1026, 94 L. Ed. 2d 92 (1987)."

"'Elliott [v. Van Kleef], 830 So. 2d [726,] 730-31 [(Ala. 2002)] (emphasis added).'

"Sverdrup Tech., Inc. v. Robinson, 36 So. 3d 34, 42-43 (Ala. 2009)."

Ex parte Excelsior Fin., Inc., 42 So. 3d 96, 100-02 (Ala. 2010).

Tiffin's second amended complaint alleged that Edgetech "is an Ohio corporation doing business in the State of Alabama" and that Quanex I.G. Systems, Inc., is an Ohio corporation "which, upon information and belief is doing business in the State of Alabama and [is] the successor company of Edgetech I.G., Inc." It further alleged:

"Defendant Quanex Building Products Corporation is a Delaware corporation, which, upon information and belief is doing business in the State of Alabama through its office located at 2001 Highway 20 West, Decatur, Alabama 35601 and which acquired Edgetech I.G., Inc., on or about April 1, 2011 and is the successor corporation."

The second amended complaint further alleged:

"The Defendants transact and engage in business in the State of Alabama, regularly do business in this State, solicit business in this State, engage in a persistent course of conduct in this State and further derive substantial revenue from goods used or consumed or services rendered in this State. Defendants Thompson and Edgetech have purposefully acted to obtain benefits and privileges in the State of Alabama and have further purposely availed

themselves of the privileges of conducting business within the State of Alabama. That Defendants sell, distribute and market their products through a network of dealers throughout Alabama, the United States, Canada and Europe. The Defendants further provide promotional materials for purposes of marketing and selling their products in the State of Alabama."

However, in support of its motion to dismiss, Edgetech submitted an affidavit from Larry Johnson, the vice president of Sales, Insulating Glass Systems, for Quanex Building Products, and the former executive president of Edgetech. In his affidavit, Johnson stated, in pertinent part:

"4. As it relates to this case, Edgetech sold a bulk amount of Super Spacer 'E-class' or 'EPDM,' to Thompson I.G., LLC ('Thompson'), a Michigan limited liability company that manufactures insulated glass units for use in residential home construction as well as in motorhomes and recreational vehicles.

"5. Once Edgetech delivers Super Spacer product to Thompson, Edgetech's involvement in the manufacture of insulated glass windows is complete. Edgetech does not control and has no means of controlling Thompson's manufacturing processes, including its use of Super Spacer. Nor does Edgetech control or have any means of controlling the system of distribution which carried Thompson's completed insulated glass units, which contain the Super Spacer product as a component part, to Alabama. In particular, Edgetech was not involved in the selection of Alabama and/or Wynne Enterprises, Inc. ('Wynne'), as the target market for Thompson's insulated glass units or in any of Thompson's decisions which led to the sale of Thompson's units to Wynne. Rather, Thompson alone

determined to sell its finished products, of which the Super Spacer is only a small piece, into Alabama.

"6. Specifically, Edgetech has no relationship with Wynne, the window manufacturer to whom Thompson sold its completed insulated glass window units. Edgetech and Wynne do not directly communicate with each other on a regular basis. Any communication between Edgetech and Wynne was initiated by Wynne or was made by Wynne at Thompson's request. Further, Edgetech has never sold any Super Spacer directly to Wynne.

"7. Nor does Edgetech have a relationship with or directly communicate with the Plaintiff in this case, Tiffin. Edgetech and Tiffin never communicated with each other until just prior to the initiation of this lawsuit, when Tiffin initiated contact and demanded payment for allegedly faulty window units. Further, Edgetech has never sold any Super Spacer to Tiffin.

"....

"9. Edgetech does not sell or ship its E-class (or EPDM) Super Spacer to any customer in Alabama.

"10. Edgetech has only two current customers in Alabama, and neither receive E-class (or EPDM) Super Spacer product. Sales to Edgetech's two Alabama customers account for less than one one-hundredth of a percent of Edgetech's overall sales.

"11. Edgetech's limited number of sales to these two customers in Alabama was not initiated by Edgetech, but was the work of an independent sales agent based out of Georgia. This independent sales agent is not employed by Edgetech, but is an independent contractor who also sells products other than Edgetech's Super Spacer on commission.

"12. Edgetech does not extend warranties on its E-Class (or EPDM) Super Spacer product to residents of Alabama, as Edgetech's standard warranty extends only to the original purchaser of its products.

"13. Edgetech does not directly target Alabama with any advertisements or otherwise directly solicit business in Alabama. While Edgetech employs internet and electronic-mail advertising, Edgetech does not target any Alabama entity with internet or electronic-mail advertising. Further, Edgetech advertises in industry or trade magazines, but it does not specifically target Alabama-based magazines.

"14. Beyond this sporadic and limited involvement with two customers in Alabama, Edgetech has no physical presence in Alabama, does not target Alabama for sales or advertising, and has never purposefully availed itself of Alabama law or the benefits of doing business in Alabama."

Johnson went on to state that Edgetech was organized under the laws of the State of Ohio and had its principal place of business in Ohio. He further stated that Edgetech did not regularly conduct business in Alabama; did not maintain a place of business in Alabama; was not licensed to do business in Alabama; was not registered as a business entity with the Alabama Secretary of State; did not have a registered agent for service of process in Alabama; did not have any office or storefront locations in Alabama; did not employ any Alabama residents; did not have its employees come to Alabama to

16

solicit sales of Super Spacer or to market Edgetech's products; did not employ any persons who otherwise work in Alabama; did not own, rent, or lease any real estate in Alabama; did not keep or store equipment or inventory in Alabama; did not have a telephone, fax, or other contact number in Alabama; did not have an Alabama mailing address; did not have any checking, savings, or other financial accounts based in Alabama; had never paid taxes to the Alabama Department of Revenue; had never had an Alabama employer-identification number; and had never sued or been sued in Alabama before this lawsuit. Johnson then asserted:

> "15. Based on the foregoing and as explained below, Tiffin's allegations in the Complaint pertaining to Edgetech's contacts with Alabama are inaccurate.

> "16. Edgetech does not regularly 'transact and engage in business in the State of Alabama, ... solicit business in [Alabama,] engage in a persistent course of conduct in [Alabama, or] further derive substantial revenue from goods used or consumed or services rendered in [Alabama].'

> "17. Edgetech has not purposefully acted to obtain the benefits, or purposefully availed itself of the privileges, of doing business in Alabama.

> "18. Edgetech does not have a network of dealers throughout Alabama, the United States of America, Canada, and Europe, but instead sells its Super

1121291

Spacer product directly to third-party insulated glass manufacturers such as Thompson.

"19. While Edgetech does allow its customers to use promotional materials carrying the Edgetech brand, Edgetech has no control over its customer's use of such materials and has never been involved in the decision to use those materials to market Super Spacer or otherwise solicit sales of Super Spacer in Alabama."

A.

Edgetech argues that Tiffin did not establish that the trial court had general jurisdiction over it. Edgetech alleges that it conducts its business in Ohio; that it manufactures its Super Spacer products in Ohio; that it sold the Super Spacer product at issue in this case to a third party in Michigan; that it delivered the product in question to Michigan; and that the party in Michigan was the third-party company that sold the glass units containing the Super Spacer product to an Alabama company. It also submitted evidence indicating that it does not maintain offices in Alabama; that it does not own or lease any property in Alabama; that it does not and has not ever had any employees in Alabama; and that it does not have any officers, employees, or directors living in Alabama. However, as Edgetech concedes, "'[a] physical presence in Alabama is not a

18

1121291

prerequisite to personal jurisdiction over a nonresident.' Sieber v. Campbell, 810 So. 2d 641, 644 (Ala. 2001)." Ex parte Reindel, 963 So. 2d 614, 617 (Ala. 2007). See also Ex parte DBI, supra. Therefore, we must determine whether Edgetech had such contacts with Alabama that it should have reasonably anticipated being haled into court here. See Reindel, supra.

The United States Supreme Court addressed the requirements for general jurisdiction in Goodyear Dunlop Tires Operations, S.A. v. Brown, ___ U.S. ___, 131 S. Ct. 2846 (2011), as follows:

> "A court may assert general jurisdiction over foreign (sister-state or foreign-country) corporations to hear any and all claims against them when their affiliations with the State are so 'continuous and systematic' as to render them essentially at home in the forum State. See International Shoe [Co. v. Washington], 326 U.S. [310,] 317 [(1945)].
>
> "....
>
> "International Shoe distinguished from cases that fit within the 'specific jurisdiction' categories, 'instances in which the continuous corporate operations within a state [are] so substantial and of such a nature as to justify suit against it on causes of action arising from dealings entirely distinct from those activities.' 326 U.S., at 318. Adjudicatory authority so grounded is today called 'general jurisdiction.' Helicopteros

19

[Nacionales de Colombia, S.A. v. Hall], 466 U.S. [408], 414, n. 9 [(1984)]. For an individual, the paradigm forum for the exercise of general jurisdiction is the individual's domicile; for a corporation, it is an equivalent place, one in which the corporation is fairly regarded as at home. See Brilmayer[ et al., A General Look at General Jurisdiction 6 Texas L. Rev. 721,] 728 [(1988)] (identifying domicile, place of incorporation, and principal place of business as 'paradig[m]' bases for the exercise of general jurisdiction).

"....

"In only two decisions postdating International Shoe, discussed infra, at ___, has this Court considered whether an out-of-state corporate defendant's in-state contacts were sufficiently 'continuous and systematic' to justify the exercise of general jurisdiction over claims unrelated to those contacts: Perkins v. Benquet Consol. Mining Co., 342 U.S. 437 (1952) (general jurisdiction appropriately exercised over Philippine corporation sued in Ohio, where the company's affairs were overseen during World War II); and Helicopteros, 466 U.S. 408 (helicopter owned by Colombian corporation crashed in Peru; survivors of U.S. citizens who died in the crash, the Court held, could not maintain wrongful-death actions against the Colombian corporation in Texas, for the corporation's helicopter purchases and purchase-linked activity in Texas were insufficient to subject it to Texas court's general jurisdiction).

"....

"A corporation's 'continuous activity of some sorts within a state,' International Shoe instructed, 'is not enough to support the demand that the corporation be amenable to suits unrelated to that activity.' 326 U.S., at 318. Our 1952 decision in Perkins v. Benquet Consol. Mining Co.

remains '[t]he textbook case of general jurisdiction appropriately exercised over a foreign corporation that has not consented to suit in the forum.' Donahue v. Far Eastern Air Transport Corp., 652 F.2d 1032, 1037 (C.A.D.C. 1981).

"Sued in Ohio, the defendant in Perkins was a Philippine mining corporation that had ceased activities in the Philippines during World War II. To the extent that the company was conducting any business during and immediately after the Japanese occupation of the Philippines, it was doing so in Ohio: the corporation's president maintained his office there, kept the company files in that office, and supervised from the Ohio office 'the necessarily limited wartime activities of the company.' Perkins, 342 U.S., at 447–448. Although the claim-in-suit did not arise in Ohio, this Court ruled that it would not violate due process for Ohio to adjudicate the controversy. Ibid.; see Keeton v. Hustler Magazine, Inc., 465 U.S. 770, 779–780, n. 11 (1984) (Ohio's exercise of general jurisdiction was permissible in Perkins because 'Ohio was the corporation's principal, if temporary, place of business').

"We next addressed the exercise of general jurisdiction over an out-of-state corporation over three decades later, in Helicopteros. In that case, survivors of United States citizens who died in a helicopter crash in Peru instituted wrongful-death actions in a Texas state court against the owner and operator of the helicopter, a Colombian corporation. The Colombian corporation had no place of business in Texas and was not licensed to do business there. 'Basically, [the company's] contacts with Texas consisted of sending its chief executive officer to Houston for a contract-negotiation session; accepting into its New York bank account checks drawn on a Houston bank; purchasing helicopters, equipment, and training services from [a Texas enterprise] for substantial sums; and sending

21

personnel to [Texas] for training.' 466 U.S., at 416. These links to Texas, we determined, did not 'constitute the kind of continuous and systematic general business contacts ... found to exist in Perkins,' and were insufficient to support the exercise of jurisdiction over a claim that neither 'ar[o]se out of ... no[r] related to' the defendant's activities in Texas. Id., at 415–416 (internal quotation marks omitted).

"Helicopteros concluded that 'mere purchases [made in the forum State], even if occurring at regular intervals, are not enough to warrant a State's assertion of [general] jurisdiction over a nonresident corporation in a cause of action not related to those purchase transactions.' Id., at 418."

___ U.S. at ___, 131 S. Ct. at 2851–57.

In its answer and brief, Tiffin does not specifically argue that Edgetech had continuous and systematic contacts that would subject it to the general jurisdiction of the trial court. Rather, Tiffin appears to focus solely on its argument that the trial court had specific jurisdiction over Edgetech. However, in its answer and brief, Tiffin does rely on this Court's decision in Ex parte Lagrone, 839 So. 2d 620 (Ala. 2002). In Lagrone, this Court relied upon the fact that the defendant in that case had placed products in the stream of commerce with the knowledge that some of those products had been sold to customers in Alabama as a basis for finding

22

general jurisdiction. However, in <u>Goodyear</u>, decided after <u>Lagrone</u>, the United States Supreme Court specifically stated that, although the stream-of-commerce test is relevant to determining whether a defendant had sufficient contacts with a State to justify the exercise of specific jurisdiction,

> "ties serving to bolster the exercise of specific jurisdiction do not warrant a determination that, based on those ties, the forum has <u>general</u> jurisdiction over a defendant. See, <u>e.g.</u>, <u>Stabilisierungsfonds Fur Wein v. Kaiser Stuhl Wine Distributors Pty. Ltd.</u>, 647 F.2d 200, 203, n.5 (C.A.D.C. 1981) (defendants' marketing arrangements, although 'adequate to permit litigation of claims relating to [their] introduction of ... wine into the United States stream of commerce, ... would not be adequate to support general, "all purpose" adjudicatory authority')."

___ U.S. at ___, 131 S. Ct. at 2855-56. Therefore, Tiffin's reliance on <u>Lagrone</u> is misplaced.

At most, the evidence before the trial court established that Edgetech had two current customers in Alabama; that its sales to those two Alabama customers account for less than one one-hundredth of a percent of Edgetech's overall sales; that those sales were not initiated by Edgetech, but were the work of an independent sales agent based out of Georgia; that the independent sales agent is not employed by Edgetech; and that the sales agent is an independent contractor who also sells

23

products other than Edgetech's. These limited contacts are not sufficient to establish the type of continuous and systematic contacts that would support a finding of general jurisdiction.[5] But cf. International Shoe Co. v. Washington, 326 U.S. 310 (1945)(holding that the defendant's contacts with the State of Washington were continuous and systematic where they resulted in a large volume of interstate business from which the defendant received the benefit and protection of the laws of the State of Washington).

B.

Edgetech next argues that it likewise did not have sufficient contacts with Alabama to subject it to the specific jurisdiction of the trial court.

1.

---

[5]In its answer and brief, Tiffin asserts that Edgetech "targeted and served the Alabama market through its own employees and sales agents." To support this assertion, Tiffin relies upon printouts from the Quanex Building Products Web site attached to its brief as Appendix C. However, we will not consider Appendix C because it was not presented to the trial court. See Ex parte East Alabama Med. Ctr., 109 So. 3d 1114, 1117 (Ala. 2012) (quoting Ex parte Cincinnati Ins. Co., 51 So. 3d 298, 310 (Ala. 2010), for the proposition that, "'in a mandamus proceeding, this Court will not consider evidence not presented to the trial court'").

1121291

Initially, Edgetech argues that this Court should overrule the test for specific personal jurisdiction set forth in Ex parte DBI, supra, based on the United States Supreme Court's decision in J. McIntyre Machinery, Ltd. v. Nicastro, ___ U.S. ___, 131 S. Ct. 2780 (2011). In Ex parte DBI, this Court stated:

> "DBI repeatedly invokes the mantra of 'fifty years of precedent,' asserting the necessity for this Court to adhere to its previous decisions addressing the issue of personal jurisdiction over nonresident defendants. Our precedent, however, is only the result of an attempt to apply the precedent of the United States Supreme Court to the facts before us. In so doing, we search for a definition of the amorphous term 'due process' the Framers applied as a limit on federal power in the Fifth Amendment and the citizens extended to the States upon ratification of the Fourteenth Amendment. We have no recent guidance from the United States Supreme Court. As previously noted, in the murky aftermath of the plurality opinions in Asahi[ Metal Industry Co. v. Superior Court of California, Solano County, 480 U.S. 102 (1987)], the task has not been made any easier. Until more definite direction is given, we revert to the last expressions from the United States Supreme Court in World-Wide Volkswagen[ Corp. v. Woodson, 444 U.S. 286 (1980),] and Burger King [Corp. v. Rudzewicz, 471 U.S. 462 (1985),] that are not hampered by the lack of a majority."

Ex parte DBI, 23 So. 3d at 649. This Court then went on to address the issue of personal jurisdiction "[u]nder the stream-of-commerce test, as articulated in World-Wide

25

Volkswagen and Burger King." 23 So. 3d at 655. Edgetech argues that the United States Supreme Court's decision in McIntyre provides more definite direction regarding specific personal jurisdiction and that, in McIntyre, the United States Supreme Court expressly rejected the stream-of-commerce test for personal jurisdiction.

The plurality opinion in McIntyre was authored by Justice Kennedy and was joined by Chief Justice Roberts and Justices Scalia and Thomas. Justice Breyer wrote an opinion concurring in the judgment, which Justice Alito joined. Finally, Justice Ginsburg wrote a dissenting opinion, which Justices Sotomayor and Kagan joined.

The United States Court of Appeals for the Federal Circuit addressed the effect of McIntyre as follows:

"The Supreme Court recently revisited the stream-of-commerce theory in McIntyre Machinery, Ltd. v. Nicastro, ___ U.S. ___, 131 S. Ct. 2780, 180 L. Ed. 2d 765 (2011). The Court, however, declined to resolve its long-standing split on that theory.

"In McIntyre, the Court was asked to revisit questions left open in Asahi Metal Industry Co. v. Superior Court of California, Solano County, 480 U.S. 102, 107 S. Ct. 1026, 94 L. Ed. 2d 92 (1987). In Asahi, the Court's members disagreed whether a defendant could be subject to personal jurisdiction in a forum merely because the defendant had placed a product in the stream of commerce. Justice

26

Brennan, writing for four Justices, evaluated personal jurisdiction under the stream-of-commerce theory by relying on considerations of foreseeability. Justice Brennan wrote that 'jurisdiction premised on the placement of a product into the stream of commerce is consistent with the Due Process Clause,' for '[a]s long as a participant in this process is aware that the final product is being marketed in the forum State, the possibility of a lawsuit there cannot come as a surprise.' Asahi, 480 U.S. at 117, 107 S. Ct. 1026 (opinion concurring in part and concurring in the judgment).

"Justice O'Connor and three other Justices rejected Justice Brennan's approach. In their view, mere foreseeability or awareness that 'the stream of commerce may or will sweep the product into the forum State' is insufficient. Id. at 112, 107 S. Ct. 1026. Justice O'Connor wrote:

"'The substantial connection between the defendant and the forum State necessary for a finding of minimum contacts must come about by an action of the defendant purposefully directed toward the forum State. The placement of a product into the stream of commerce, without more, is not an act of the defendant purposefully directed toward the forum State.'

"Id. (citing Burger King, 471 U.S. at 476, 105 S. Ct. 2174; Keeton v. Hustler Magazine, Inc., 465 U.S. 770, 774, 104 S. Ct. 1473, 79 L. Ed. 2d 790 (1984)) (internal quotation marks omitted).

"Because neither Justice Brennan's nor Justice O'Connor's test garnered a majority of the votes in Asahi, neither test prevailed as the applicable precedent.

"The Court declined to resolve the Asahi split in McIntyre. In a plurality opinion, Justice

27

Kennedy acknowledged the imprecision of the metaphor 'stream of commerce,' stating that '[i]t refers to the movement of goods from manufacturers through distributors to consumers, yet beyond that descriptive purpose its meaning is far from exact.' McIntyre, 131 S. Ct. at 2788. The plurality sided with Justice O'Connor's approach in Asahi, concluding that the 'principal inquiry' is 'whether the defendant's activities manifest an intention to submit to the power of a sovereign. In other words, the defendant must "purposefully avai[l] itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws."' Id. (quoting Hanson v. Denckla, 357 U.S. 235, 253, 78 S. Ct. 1228, 2 L. Ed. 2d 1283 (1958)). Justice Kennedy noted that '[t]he defendant's transmission of goods permits the exercise of jurisdiction only where the defendant can be said to have targeted the forum; as a general rule, it is not enough that the defendant might have predicted that its goods will reach the forum State.' Id. He further reasoned that Justice Brennan's approach was inconsistent with precedent, holding that 'it is the defendant's actions, not his expectations, that empower a State's courts to subject him to judgment.' Id. at 2789. A court's jurisdiction, in other words, is 'a question of authority rather than fairness.' Id.

"Justice Breyer, joined by Justice Alito, declined to join Justice Kennedy's plurality opinion. Justice Breyer further declined to endorse revising the jurisdictional standard at all. He acknowledged that developments in commerce and communication, such as globalization, have occurred since the Court last considered the stream-of-commerce theory. Id. at 2791. Such 'modern-day consequences' were not at issue in McIntyre, however, and Justice Breyer deemed it unwise to revise the jurisdictional standard in a case that did not present those consequences. Id. He wrote:

28

> "'[O]n the record presented here, resolving this case requires no more than adhering to our precedents.... I would not go further. Because the incident at issue in this case does not implicate modern concerns, and because the factual record leaves open many questions, this is an unsuitable vehicle for making broad pronouncements that refashion basic jurisdictional rules.'

"Id. at 2792-93. Thus, the crux of Justice Breyer's concurrence was that the Supreme Court's framework applying the stream-of-commerce theory -- including the conflicting articulations of that theory in Asahi -- had not changed, and that the defendant's activities in McIntyre failed to establish personal jurisdiction under any articulation of that theory. Id.

> "Because McIntyre did not produce a majority opinion, we must follow the narrowest holding among the plurality opinions in that case. Marks v. United States, 430 U.S. 188, 193, 97 S. Ct. 990, 51 L. Ed. 2d 260 (1977). The narrowest holding is that which can be distilled from Justice Breyer's concurrence -- that the law remains the same after McIntyre."

AFTG-TG, LLC v. Nuvoton Tech. Corp., 689 F.3d 1358, 1362-63 (Fed. Cir. 2012). See also Simmons v. Big No. 1 Motor Sports, Inc., 908 F. Supp. 2d 1224, 1228-29 (N.D. Ala. 2012); Ainsworth v. Cargotec USA, Inc., (No. CV 2:10-CV-236-KS-MTP, September 23, 2011) (S.D. Miss. 2011) (not reported in F. Supp. 2d). But see, e.g., Smith v. Teledyne Continental Motors, Inc., 840 F. Supp. 2d 927, 931 (D.S.C. 2012) (stating

that, in McIntyre, "six Justices agree that, at a minimum, the limitations of Justice O'Connor's test should be applied" and that the "'stream-of-commerce plus' test now commands a majority of the Court"); Windsor v. Spinner Indus. Co., 825 F. Supp. 2d 632, 638 (D. Md. 2011) (construing McIntyre "as rejecting the foreseeability standard of personal jurisdiction, but otherwise leaving the legal landscape untouched").

Contrary to Edgetech's argument, the United States Supreme Court's decision in McIntyre does not squarely indicate that that Court has rejected the stream-of-commerce test articulated in World-Wide Volkswagen Corp. v. Wilson, 444 U.S. 286 (1980), and Burger King Corp. v. Rudzewicz, 471 U.S. 462 (1985), or the test for personal jurisdiction adopted by this Court in Ex parte DBI. Rather, courts in other jurisdictions are divided as to the effect of McIntyre. Additionally, Justice Breyer's concurring opinion makes it clear that he was not enunciating a new rule of jurisdiction; rather, he was strictly adhering to that Court's precedents. In Ex parte DBI, based on the fractured opinion in Asahi, this Court "revert[ed] to the last expression from the United

30

States Supreme Court in <u>World-Wide Volkswagen</u> and <u>Burger King</u>." 23 So. 3d at 649. Thus, we decline Edgetech's request to overrule <u>Ex parte DBI</u> based on the United States Supreme Court's decision in <u>McIntyre</u>.

2.

Next, we must determine whether, under the test set forth in <u>Ex parte DBI</u>, Edgetech had sufficient contacts to establish specific jurisdiction in Alabama. In <u>Ex parte DBI</u>, Tonya Leytham, as administratrix and personal representative of Tiffany Stabler's estate and as Stabler's mother and next friend, sued DBI, a manufacturer of seat belts; Kia Motors America, Inc., and Kia Motors Corporation (hereinafter collectively referred to as "Kia Motors"); and several other defendants. The lawsuit arose from an automobile accident that resulted in Stabler's death. At the time of the accident, Stabler was driving an automobile that had been manufactured by Kia Motors and that was equipped with a seat belt that had been manufactured by DBI. Leytham alleged that Stabler was wearing her seat belt at the time of the accident and that the seat belt had malfunctioned and allowed Stabler to be ejected from the vehicle.

1121291

DBI was located in the Republic of Korea ("South Korea"), and it alleged that it did not do any direct business with or in the United States. However, DBI manufactured seat belts for Kia Motors. Additionally,

> "Leytham points out that DBI contracted with a New Jersey company to test its seat belts to obtain a label stating that the seat belts complied with the FMVSS,[6] which rendered the seat belts marketable in the United States. Furthermore, Leytham says, DBI entered into a claims-indemnification contract with Kia Motors; it maintains insurance coverage against risks or losses occurring in the United States; and it retains defense counsel here. Leytham argues that because DBI designed its seat belts to comply with the FMVSS and because it knew that Kia Motors would incorporate its seat belts into automobiles that would be sold nationally in the United States, DBI should have known that some of those automobiles would be sold in Alabama. Should any of those seat belts prove defective, Leytham says, DBI should have anticipated that it could be sued in Alabama."

23 So. 3d at 654.

DBI filed a motion to dismiss, arguing that the trial court did not have personal jurisdiction over it. Ultimately, the trial court denied DBI's motion to dismiss, and DBI filed a petition for a writ of mandamus in this Court.

---

[6]"FMVSS" is an acronym for Federal Motor Vehicle Safety Standards.

32

1121291

This Court addressed the existing precedent of the United States Supreme Court in light of the facts presented in that case, as follows:

> "In <u>World-Wide Volkswagen</u>, the plaintiffs, New York residents, purchased an Audi automobile from a New York dealership. The Audi was manufactured in Germany and imported into the United States by Volkswagen of America, Inc. World-Wide Volkswagen Corporation, the regional distributor of the Audi, served the states of New York, New Jersey, and Connecticut. In the course of traveling from New York to Arizona, the plaintiffs were involved in an automobile accident in Oklahoma. They later brought a products-liability action in Oklahoma, naming as defendants the manufacturer, importer, regional distributor, and dealership of the Audi. Both World-Wide Volkswagen and the New York dealership sought a writ prohibiting the trial judge from exercising in personam jurisdiction over them. When the Supreme Court of Oklahoma denied relief, they sought certiorari review in the United States Supreme Court. The Supreme Court reversed the judgment of the Supreme Court of Oklahoma, holding that the New York distributor and dealership did not have sufficient minimum contacts with Oklahoma to subject them to suit there. The Court stated:
>
> > "'As has long been settled, and as we reaffirm today, a state court may exercise personal jurisdiction over a nonresident defendant only so long as there exist "minimum contacts" between the defendant and the forum State. The concept of minimum contacts, in turn, can be seen to perform two related, but distinguishable, functions. It protects the defendant against the burdens of litigating in a distant or inconvenient forum. And it acts to ensure that the States, through their

33

courts, do not reach out beyond the limits imposed on them by their status as coequal sovereigns in a federal system.

"'The protection against inconvenient litigation is typically described in terms of "reasonableness" or "fairness." We have said that the defendant's contacts with the forum State must be such that maintenance of the suit "does not offend 'traditional notions of fair play and substantial justice.'" The relationship between the defendant and the forum must be such that it is "reasonable ... to require the corporation to defend the particular suit which is brought there." Implicit in this emphasis on reasonableness is the understanding that the burden on the defendant, while always a primary concern, will in an appropriate case be considered in light of other relevant factors, including the forum State's interest in adjudicating the dispute; the plaintiff's interest in obtaining convenient and effective relief, at least when that interest is not adequately protected by the plaintiff's power to choose the forum; the interstate judicial system's interest in obtaining the most efficient resolution of controversies; and the shared interest of the several States in furthering fundamental substantive social policies.

"'The limits imposed on state jurisdiction by the Due Process Clause, in its role as a guarantor against inconvenient litigation, have been substantially relaxed over the years. As we noted in McGee v. International Life Ins. Co., supra, 355 U.S. [220], at 222-223, 78 S. Ct. [199], at 201 [(1957)], this trend is largely attributable to a

fundamental transformation in the American economy:

"'"Today many commercial transactions touch two or more States and may involve parties separated by the full continent. With this increasing nationalization of commerce has come a great increase in the amount of business conducted by mail across state lines. At the same time modern transportation and communication have made it much less burdensome for a party sued to defend himself in a State where he engages in economic activity."

"'The historical developments noted in McGee, of course, have only accelerated in the generation since that case was decided.'

"444 U.S. at 291-93, 100 S. Ct. 559 (citations omitted).

"It is clear from World-Wide Volkswagen that foreseeability alone is not the determining factor.

"'....

"'This is not to say, of course, that foreseeability is wholly irrelevant. But the foreseeability that is critical to due process analysis is not the mere likelihood that a product will find its way into the forum State. Rather, it is that the defendant's conduct and connection with the forum State are such that he should reasonably anticipate being haled into court there. The Due Process Clause, by

> ensuring the "orderly administration of the laws," gives a degree of predictability to the legal system that allows potential defendants to structure their primary conduct with some minimum assurance as to where that conduct will and will not render them liable to suit.
>
> "'When a corporation "purposefully avails itself of the privilege of conducting activities within the forum State," it has clear notice that it is subject to suit there, and can act to alleviate the risk of burdensome litigation by procuring insurance, passing the expected costs on to customers, or, if the risks are too great, severing its connection with the State. Hence if the sale of a product of a manufacturer or distributor such as Audi or Volkswagen is not simply an isolated occurrence, but arises from the efforts of the manufacturer or distributor to serve, directly or indirectly, the market for its product in other States, it is not unreasonable to subject it to suit in one of those States if its allegedly defective merchandise has there been the source of injury to its owner or to others. The forum State does not exceed its powers under the Due Process Clause if it asserts personal jurisdiction over a corporation that delivers its products into the stream of commerce with the expectation that they will be purchased by consumers in the forum State.'

"444 U.S. at 295-98, 100 S. Ct. 559 (footnote omitted) (citations omitted).

"The United States Supreme Court expanded on the subject of personal jurisdiction in Burger King. ... The Court stated:

"'We have noted several reasons why a forum legitimately may exercise personal jurisdiction over a nonresident who "purposefully directs" his activities toward forum residents. A State generally has a "manifest interest" in providing its residents with a convenient forum for redressing injuries inflicted by out-of-state actors. Moreover, where individuals "purposefully derive benefit" from their interstate activities, it may well be unfair to allow them to escape having to account in other States for consequences that arise proximately from such activities; the Due Process Clause may not readily be wielded as a territorial shield to avoid interstate obligations that have been voluntarily assumed. And because "modern transportation and communications have made it much less burdensome for a party sued to defend himself in a State where he engages in economic activity," it usually will not be unfair to subject him to the burdens of litigating in another forum for disputes relating to such activity.

"'Notwithstanding these considerations, the constitutional touchstone remains whether the defendant purposefully established "minimum contacts" in the forum State. Although it has been argued that foreseeability of causing injury in another State should be sufficient to establish such contacts there when policy considerations so require, the Court has consistently held that this kind of foreseeability is not a "sufficient benchmark" for exercising personal jurisdiction. Instead, "the foreseeability that is critical to due process analysis ... is that the defendant's conduct and

connection with the forum State are such that he should reasonably anticipate being haled into court there." In defining when it is that a potential defendant should "reasonably anticipate" out-of-state litigation, the Court frequently has drawn from the reasoning of Hanson v. Denckla, 357 U.S. 235, 253 (1958):

"'"The unilateral activity of those who claim some relationship with a nonresident defendant cannot satisfy the requirement of contact with the forum State. The application of that rule will vary with the quality and nature of the defendant's activity, but it is essential in each case that there be some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws."

"'This "purposeful availment" requirement ensures that a defendant will not be haled into a jurisdiction solely as a result of "random," "fortuitous," or "attenuated" contacts, or of the "unilateral activity of another party or a third person." Jurisdiction is proper, however, where the contacts proximately result from actions by the defendant himself that create a "substantial connection" with the forum State. Thus where the defendant "deliberately" has engaged in significant activities within a State, or has created "continuing obligations" between himself and residents of the forum, he manifestly has availed

himself of the privilege of conducting business there, and because his activities are shielded by "the benefits and protections" of the forum's laws it is presumptively not unreasonable to require him to submit to the burdens of litigation in that forum as well.

"'Jurisdiction in these circumstances may not be avoided merely because the defendant did not <u>physically</u> enter the forum State. Although territorial presence frequently will enhance a potential defendant's affiliation with a State and reinforce the reasonable foreseeability of suit there, it is an inescapable fact of modern commercial life that a substantial amount of business is transacted solely by mail and wire communications across state lines, thus obviating the need for physical presence within a State in which business is conducted. So long as a commercial actor's efforts are "purposefully directed" toward residents of another State, we have consistently rejected the notion that an absence of physical contacts can defeat personal jurisdiction there.'

"471 U.S. at 473-76, 105 S. Ct. 2174 (footnotes omitted) (citations omitted). Significantly, the Supreme Court in <u>Burger King</u> quoted from <u>World-Wide Volkswagen</u> as follows:

"'Thus "[t]he forum State does not exceed its powers under the Due Process Clause if it asserts personal jurisdiction over a corporation that delivers its products into the stream of commerce with the expectation that they will be purchased by consumers in the forum State" and those products subsequently injure forum consumers.'

39

"471 U.S. at 473, 105 S. Ct. 2174 (quoting World-Wide Volkswagen, 444 U.S. at 297-98, 100 S. Ct. 559)."

23 So. 3d at 649-54.

Ultimately, this Court held that DBI had purposefully availed itself of the privilege of doing business in Alabama and that it would not offend the requirements of due process for Alabama courts to exercise jurisdiction over DBI. Specifically, this Court stated:

"Although DBI has never had a physical presence in Alabama, being physically present in a state is not required in order for a state court to have personal jurisdiction over a defendant. Burger King, 471 U.S. at 476, 105 S. Ct. 2174. DBI knew that its seat belts were incorporated into automobiles sold by Kia Motors in the United States. It is not subject to reasonable dispute that it is generally known that a product such as a mass-produced automobile is marketed on a broad spectrum and is not a boutique product fit for only a narrow class of consumers. Likewise, an automobile manufacturer is involved in the sales of its products on a national as opposed to a regional basis. Perhaps the supplier of a part to a snow-plow manufacturer could reasonably say it did not anticipate that its product would be sold in Alabama, but, clearly, moderately priced, fuel-efficient automobiles, such as those manufactured by Kia Motors, are destined for sale in all 50 states in this country. Kia Motors has nine dealerships in Alabama. DBI, by choosing to enter into a contractual relationship with Kia Motors pursuant to which DBI would turn a profit by supplying an essential component part vital to the safety of passengers for such automobiles under the circumstances here described, cannot reasonably

40

assert ignorance of these realities of the
marketplace.

"The facts presented here stand in stark
contrast to the facts in World-Wide Volkswagen in
which the Court found the absence of 'purposeful
availment' in the context of the confluence of a
random and unilateral event in the forum state. See
Burger King, 471 U.S. at 474, 105 S. Ct. 2174,
quoting Hanson v. Denckla, 357 U.S. 235, 253, 78 S.
Ct. 1228, 2 L. Ed. 2d 1283 (1958) ('"The unilateral
activity of those who claim some relationship with
a nonresident defendant cannot satisfy the
requirement of contact with the forum State."') and
471 U.S. at 475, 105 S. Ct. 2174 ('This "purposeful
availment" requirement ensures that a defendant will
not be haled into a jurisdiction solely as a result
of "random," "fortuitous," or "attenuated" contacts,
or of the "unilateral activity of another party or
a third person."' (citations omitted)); World-Wide
Volkswagen, 444 U.S. at 299, 100 S. Ct. 559.

"Under the stream-of-commerce test, as
articulated in World-Wide Volkswagen and Burger
King, we conclude that the trial court correctly
held that an Alabama court can exercise personal
jurisdiction over DBI. As previously noted, the
United States Supreme Court stated in both World-
Wide Volkswagen and Burger King that '"[t]he forum
State does not exceed its powers under the Due
Process Clause if it asserts personal jurisdiction
over a corporation that delivers its products into
the stream of commerce with the expectation that
they will be purchased by consumers in the forum
State" and those products subsequently injure forum
consumers.' 471 U.S. at 473, 444 U.S. at 297-98.

"The automobile containing the seat belt that
Leytham alleges malfunctioned and contributed to
Stabler's death did not find its way to Alabama
randomly and fortuitously. To the contrary, a
dealer acting for a manufacturer with which DBI had
significant ties sold the vehicle in Alabama to an

41

Alabama resident who was driving on an Alabama highway when she died as a result of the accident that is the subject of this lawsuit. In this respect, the circumstances here are totally different from those in World-Wide Volkswagen, where an automobile purchased in New York from a New York dealer by New York residents happened to be involved in an accident in Oklahoma.

"As the Supreme Court stated in World-Wide Volkswagen, the foreseeability crucial to a due-process analysis is not the 'mere likelihood' that a product will find its way into the forum state but that a defendant's conduct and its connection with the forum state 'are such that he should reasonably anticipate being haled into court there.' 444 U.S. at 297, 100 S. Ct. 559. In selling seat belts compliant with the FMVSS to Kia Motors, DBI should have foreseen that a certain percentage of the automobiles manufactured by Kia Motors would be distributed to the Kia dealerships in Alabama and sold in Alabama. Therefore, we hold that it would have been reasonable for DBI to anticipate being haled into court in Alabama. Indeed, DBI purchased insurance to protect itself in such event."

23 So. 3d at 654-56 (emphasis added).

The facts in this case are distinguishable from those presented in DBI. In DBI, there was evidence indicating that DBI had had its seat belts tested and had obtained a label stating that the seat belts complied with the Federal Motor Vehicle Safety Standards, which compliance rendered the seat belts marketable in the United States. In the "Declaration of Larry E. Johnson" Tiffin submitted in support of its opposition to Edgetech's motion to dismiss, Johnson stated

that "EPDM Super Spacer has passed industry standard testing involving weather cycling, high humidity, dew point, volatile fog, compression and durability (P1 Chamber)." However, Tiffin did not present any evidence indicating that meeting such requirements was necessary for Edgetech to market its Super Spacer product in the United States or in Alabama.

Additionally, in DBI, DBI knew that its seat belts were being incorporated into automobiles that were being sold by Kia Motors in the United States and that Kia Motors owned nine dealerships in Alabama. This Court noted that a dealer acting for Kia Motors, with whom DBI had significant ties, had sold the vehicle at issue in that case in Alabama to an Alabama resident. In this case, Edgetech manufactured its Super Spacer products in Ohio, and it sold those products to Thompson, a Michigan company. However, Tiffin did not present evidence indicating that Edgetech knew that its Super Spacer products were going to be incorporated into insulated-glass units Thompson would sell in Alabama. Additionally, Tiffin did not present any evidence indicating that Thompson had distributors in Alabama or that a Thompson distributor in Alabama sold the insulated-glass units to an Alabama company.

Further, as Johnson noted in his April 16, 2013,

affidavit, once Edgetech delivered its Super Spacer product to Thompson, its involvement in the manufacturing process was complete. Also, Johnson asserted that Edgetech did not have any control over Thompson's distribution of the completed insulated-glass units containing the Super Spacer product and was not involved in Thompson's decision to sell the insulated-glass units to Wynne Enterprises. Further, Johnson asserted that Edgetech did not have any relationship with Wynne Enterprises and that it did not sell any Super Spacer product directly to Wynne Enterprises. Johnson went on to state that Edgetech and Wynne Enterprises did not communicate directly "on a regular basis" and asserted that any communication between the two "was initiated by Wynne [Enterprises] or was made by Wynne [Enterprises] at Thompson's request." Finally, the evidence before this Court indicates that Edgetech did not have any relationship with Tiffin. Therefore, there is no evidence before this Court indicating that Edgetech's actions created substantial contacts between Edgetech and Alabama. Rather, it appears that Tiffin seeks to hale Edgetech into an Alabama court based on Thompson's unilateral activity of selling to Wynne Enterprises insulated-glass units that include the Super Spacer product. However, Tiffin has not

44

established that, in selling its Super Spacer product to Thompson, Edgetech should have foreseen that a certain percentage of its Super Spacer products would be used in insulated-glass units that would be distributed and sold in Alabama.

Unlike the plaintiff in Ex parte DBI, Tiffin has not presented evidence to establish that Edgetech purposefully availed itself of the privilege of doing business in Alabama. Although there was evidence indicating that Edgetech placed the Super Spacer products into the stream of commerce, Tiffin did not present any evidence indicating that Edgetech had done so "'with the expectation'" that those products would be purchased by consumers in Alabama. Ex parte DBI, 23 So. 3d at 655 (quoting World-Wide Volkswagen, 471 U.S. at 473, and Burger King, 444 U.S. at 297-98). Accordingly, Edgetech's conduct and its connection with Alabama were not "'such that [it] should reasonably anticipate being haled into court'" here. Id. Thus, under the tests set forth in World-Wide Volkswagen, Burger King, and Ex parte DBI, we conclude that the trial court erred when it held that an Alabama court can exercise personal jurisdiction over Edgetech.

## Conclusion

For the above-stated reasons, we grant Edgetech's petition and direct the Franklin Circuit Court to vacate its order denying Edgetech's motion to dismiss and to enter an order granting the motion on the ground of lack of personal jurisdiction and dismissing the case against Edgetech.

PETITION GRANTED; WRIT ISSUED.

Stuart, Bolin, Murdock, and Bryan, JJ., concur.

Shaw and Main, JJ., concur in the result.

Moore, C.J., and Parker, J., dissent.